In the

# United States Court of Appeals

## For the Seventh Circuit

No. 22-3082

DESHAWN HAROLD JEWELL,

*Petitioner-Appellant,*

*v.*

GARY BOUGHTON,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 19-cv-00658 — **Pamela Pepper**, *Chief Judge.*

ARGUED NOVEMBER 6, 2023 — DECIDED JANUARY 22, 2024

Before FLAUM, SCUDDER, and KIRSCH, *Circuit Judges.*

FLAUM, *Circuit Judge.* During jury deliberations in DeShawn Harold Jewell's criminal trial, the trial court answered a jury question *ex parte.* Jewell challenged the *ex parte* communication on direct appeal, but the Wisconsin Court of Appeals concluded that any error was harmless. Jewell now seeks habeas relief under the Antiterrorism and Effective Death Penalty Act arguing that the state appellate court unreasonably applied Supreme Court precedent in its

harmlessness analysis. Because the Wisconsin Court of Appeals did not unreasonably apply *Chapman v. California*, 386 U.S. 18 (1967), and the communication did not have a substantial and injurious effect on the jury's verdict, we affirm.

## I.    Background

In 2015, a Wisconsin jury convicted DeShawn Harold Jewell of robbery by use of force and bail jumping. The robbery conviction stemmed from a March 2015 robbery of a woman, C.F., outside of a Milwaukee tavern.

At trial, C.F. testified that as she was walking from the tavern to her car, a vehicle pulled up next to her. A stranger got out and demanded that she hand over her purse or he would shoot. C.F. resisted, knocking off the stranger's black and red winter hat. The stranger took C.F.'s purse and drove off, leaving his hat behind. Testing revealed that Jewell was a "major contributor" to DNA found on the hat, although there were two other, unidentified, minor contributors.

A month after the robbery, and after receiving the DNA results, Milwaukee Police prepared a photo lineup. That involved creating a "six pack"—a one-page internal document with Jewell's photo and photos of five other supposedly physically similar individuals. On the six pack, Jewell's photo appeared second.

The police also created a photo array. The array consisted of eight folders—one containing Jewell's photo, five containing photos of the other individuals on the six pack, and two empty folders. Officers testified that they shuffled the folders and C.F. identified her assailant in the third folder, which contained Jewell's photograph. C.F. later testified that she was

confident her assailant's photo was in the array because, before showing her the folders, an officer told her that "he was going to get him." At trial, the prosecution entered the six pack, not the array, into evidence.

C.F. also identified Jewell as her assailant in court, but throughout the trial, Jewell repeatedly challenged her identification. Specifically, he argued that the photo array procedure did not adhere to best practices, that two of the individuals in the array did not look like him, and that police improperly encouraged C.F. to make an identification. However, Jewell did not challenge the numbering of the photo array and six pack.

After deliberating for two hours, the jury sent a note to the trial court asking to "see the six-pack photo." The court sent the six pack to the jury room, triggering a second note asking, "Is the '6 pack' numbering system the same as the order as the photo/folder in the photo array?" The trial court responded, "No," without consulting the parties. Shortly thereafter, the jury returned a verdict.

Before reading the verdict, the trial court told the parties about the jury's questions and his response. The trial court explained that its answer to the jury was "[b]ased upon the testimony that [the court] received on how the six pack was put together and based upon [its] 40 years of doing this." Jewell disagreed with the trial court's approach. His counsel explained that his "preference would have been to have the jury [rely on] their collective memory of the testimony," but acknowledged that "the six-pack and the photo array [numbering] are never the same." The trial court was not moved, stating, "[I]f you had raised that, I would have overruled [it]." After reading the jury's guilty verdict, the trial court

sentenced Jewell to eight years' imprisonment and five years' supervised release.

Jewell later moved for postconviction relief arguing, among other things, that the court deprived him of his Sixth Amendment rights by answering the jury's question *ex parte*. The trial court denied the motion, stating that it provided a correct answer and Jewell's presence would not have changed it. The Wisconsin Court of Appeals affirmed Jewell's conviction and the denial of postconviction relief. While it held that the trial court committed a constitutional error by communicating *ex parte* with the jury, it concluded that this error was harmless.

Jewell subsequently filed a *pro se* habeas petition arguing that the trial court violated his Sixth Amendment rights by communicating *ex parte* with the jury. The district court denied habeas relief but granted a certificate of appealability. This appeal followed.

## II.    Discussion

"We review a district court's ruling on a petition for habeas relief de novo." *Thurston v. Vanihel*, 39 F.4th 921, 928 (7th Cir. 2022). "[A]lthough we technically hear this appeal from the district court, we focus on the decision of the last state court to rule on the merits of petitioner's claim." *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014) (alteration in original) (citation and internal quotation marks omitted). Here, that is the Wisconsin Court of Appeals' ruling that the trial court's *ex parte* jury communication was a harmless error.

"When a habeas petition challenges a state court conviction, '[o]ur review is governed and (greatly limited) by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").'" *Thurston*, 39 F.4th at 928 (alteration in original) (quoting *Hicks v. Hepp*, 871 F.3d 513, 524 (7th Cir. 2017)). "Under AEDPA, habeas relief is only warranted if the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Scott v. Hepp*, 62 F.4th 343, 346 (7th Cir. 2023) (quoting 28 U.S.C. § 2254(d)(1)). While we will not "merely rubber-stamp approval of state-court decisions," *Rhodes v. Dittman*, 903 F.3d 646, 655 (7th Cir. 2018), "[AEDPA] is a deferential and 'difficult to meet' standard," *Jones v. Cromwell*, 75 F.4th 722, 726 (7th Cir. 2023) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

Petitioners must also clear a second hurdle for relief. "[A] petitioner who prevails under AEDPA must still … persuade a federal habeas court that 'law and justice require' relief." *Brown v. Davenport*, 596 U.S. 118, 134 (2022) (quoting 28 U.S.C. § 2243); *see also Jones*, 75 F.4th at 726. To do so, a petitioner challenging a state court's harmless error ruling must prove that the trial court's error "had a substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation and internal quotation marks omitted); *see also Brown*, 596 U.S. at 134 (explaining "federal habeas courts [must still] … apply this Court's precedents governing the appropriate exercise of equitable discretion— including *Brecht*"); *Brown v. Eplett*, 48 F.4th 543, 557 (7th Cir. 2022).

Accordingly, "a federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [the Supreme] Court's equitable precedents or AEDPA. But to *grant* relief, a court must find that the petitioner has cleared both tests."

*Brown*, 596 U.S. at 134. Jewell has not satisfied either requirement.

### A. AEDPA

Starting with AEDPA's statutory requirements, Jewell argues that the Wisconsin Court of Appeals unreasonably applied *Chapman* when it held that the trial court's error—communicating *ex parte* with the jury—was harmless.[1]

"A state-court decision unreasonably applies federal law if it 'applies [the Supreme] Court's precedents to the facts in an objectively unreasonable manner.'" *Pruitt v. Neal*, 788 F.3d 248, 263 (7th Cir. 2015) (alteration in original) (quoting *Brown v. Payton*, 544 U.S. 133, 141 (2005)). This bar is high. Objectively unreasonable does not mean "merely wrong" or a "clear error." *Scott*, 62 F.4th at 346 (quoting *Pruitt*, 788 F.3d at 263). "Instead, the ruling must contain 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* at 346–47.

Under *Chapman*, a constitutional error can be held harmless if the reviewing court can "declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. The Wisconsin Court of Appeals provided two rationales for its conclusion that the trial court's error was harmless: (1) there was sufficient evidence for Jewell's robbery conviction, and (2) the trial court's answer was based on unchallenged trial

---

[1] It is undisputed that the trial court erred when communicating *ex parte* with the jury. *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004) (explaining that the Confrontation Clause and Due Process Clause secure a defendant's right to be present during communications between the judge and the jury); *see also Ellsworth v. Levenhagen*, 248 F.3d 634, 640 (7th Cir. 2001).

testimony (*i.e.*, factually correct). According to Jewell, both rationales unreasonably applied *Chapman*.

Jewell is correct about the appellate court's first rationale. It unreasonably applied *Chapman* when it substituted a sufficiency-of-the-evidence analysis for harmless-error review. "Time and again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict." *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. 2015). The question is not whether the legally admitted evidence was sufficient, but rather whether the State proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24; *see also Jensen*, 800 F.3d at 902.

Still, this unreasonable application of federal law does not necessarily warrant habeas relief. "[A] federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable," *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)). Since the Wisconsin appellate court offered two rationales to support its harmlessness decision, Jewell must show that both were unreasonable applications of *Chapman* to prevail.

The appellate court's second basis for rejecting Jewell's habeas petition was that "the trial court's answer was factually correct" because it relied on "undisputed trial testimony." At trial, "[d]efense counsel conceded that the [photo array and six pack] numbering systems [were] different." Jewell argues that the appellate court unreasonably applied *Chapman* when it failed to consider whether the trial judge invaded the jury's province as sole factfinder by crediting the (unchallenged) testimony of the prosecution's witnesses. Ultimately,

fairminded jurists could disagree, precluding relief. *See Harrington*, 562 U.S. at 101 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." (internal citation and quotation marks omitted)).

Few courts have considered whether *ex parte* communications like those at issue here are harmless. Those that have reached varying outcomes, reflecting room for fairminded disagreement. Importantly, all were on direct appeal.

For example, in *United States v. Gomez*, the Tenth Circuit held that a factually accurate answer based on precise trial testimony was harmless beyond a reasonable doubt. 67 F.3d 1515, 1529–30 (10th Cir. 1995). There, during deliberations for drug distribution charges, the jury asked, "Cocaine brick— was it in a brown paper bag @ time of drug deal[?]" *Id.* at 1527. The district court *ex parte* replied, "It was not in the same brown paper bag at the time of the transaction." *Id.*

Like here, the defendant in *Gomez* did "not claim that the court's answer was factually inaccurate[;] he simply claim[ed] that he should have had input into the answer." *Id.* at 1529. But as our sister circuit noted, since the district court's answer was directly supported by trial testimony, with no need "to draw inferences from [the] testimony in order to answer" the question, the court's *ex parte* communication was harmless beyond a reasonable doubt. *Id.* at 1529–30.

The First Circuit, by contrast, disagreed that a trial court's answer to a substantive question constituted a harmless error. In *United States v. Argentine*, a jury in a wire fraud trial asked for the dates that the defendant talked with two witnesses.

814 F.2d 783, 785 (1st Cir. 1987). The trial court replied, "We've checked the record" and provided dates of two conversations but told the jurors the record was unclear as to another date. *Id.* at 786. In holding this answer was not harmless, the First Circuit explained that even if the matter was undisputed—that is, not "directly contradicted by conflicting evidence"—the trial court invaded the factfinders' province as to a "fundamental question[] of fact." *Id.* at 788–89.

This Circuit has grappled with similar harmlessness determinations. In *United States v. Neff*, a jury asked the trial court to "clarify some events" including two timing questions. 10 F.3d 1321, 1323 (7th Cir. 1993). The trial court responded with specific dates and times. *Id.* To provide those answers, the judge "introduced additional facts that [were] not found in the evidence presented at trial." *Id.* at 1325. On direct appeal, we readily concluded that error was not harmless. *Id.*

Another issue in *Neff* was a "closer call." *Id.* The jury also asked the trial court whether the defendant was released after questioning by police. *Id.* at 1323. The trial court responded, "No." *Id.* To answer that question, the trial court had to make "infer[ences] from certain [trial] testimony." *Id.* at 1325. While not as obviously problematic as relying on facts not in evidence, the inference "was [one] to be drawn by the jury as fact finder—not by the judge." *Id.*

If this case was on direct appeal, it could similarly present a close call. Like *Gomez*, the trial court gave a factually correct answer to an unchallenged issue. At trial, officers testified that they prepared an internal six-pack, where Jewell appeared second, and shuffled the photo array folders before C.F. identified Jewell in the third folder. Jewell did not argue, or even hint, that the numbering of the array and six pack was the

same. Moreover, Jewell's counsel conceded to the trial court that the answer was correct. That said, the trial testimony here is not as precise as it was in *Gomez* so a court could conclude, as we did in *Neff*, that the trial court made a reasonable inference that should have nevertheless been left to the jury.

But we are not on direct appeal. A close call on which there is room for fairminded disagreement will not suffice. It is not objectively unreasonable for a fairminded jurist to conclude that the trial court's correct answer to an unchallenged point is harmless under *Chapman*. Fairminded jurists may also come out the other way. The Wisconsin Court of Appeals may have arguably been wrong or committed error, but it did not commit an error "beyond any possibility for fairminded disagreement." *Scott*, 62 F.4th at 346–47 (citation and internal quotation marks omitted). Accordingly, habeas relief is not warranted.

## B.  Equitable Precedents

Even assuming that the Wisconsin Court of Appeals unreasonably applied *Chapman*, a second barrier remains. Jewell must persuade us that "law and justice require" relief by proving that the error had a "substantial and injurious effect or influence on the jury's verdict" under *Brecht*. *Brown*, 596 U.S. at 133–34; *see also Brown*, 48 F.4th at 557. He cannot.

*Brecht* "requires that we make a probabilistic assessment in determining whether the instructional error had a substantial and injurious effect or influence in determining the jury's verdict." *Brown*, 48 F.4th at 561. To do so "we must ask ourselves 'whether a properly instructed jury would have arrived at the same verdict, absent the error.'" *Id.* (quoting *Armfield v. Nicklaus*, 985 F.3d 536, 543–44 (7th Cir. 2021)). This assessment

includes a consideration of "the overall strength of the State's case against the totality of the evidence." *Id*. Under this standard, a court may only grant habeas relief if it "harbor[s] 'grave doubt' … about whether the trial error affected the verdict's outcome." *Brown*, 596 U.S. at 135–36 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)); *see also O'Neal*, 513 U.S. at 435 ("By 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.").

Jewell argues that the error impacted the verdict because the *ex parte* communication bore on a key issue in a weak case, evidenced by the guilty verdict shortly after the communication. As Jewell sees it, C.F.'s photo array identification was emphasized throughout the trial, and the jury's question suggests a focus on the array during deliberations as well. The trial court's *ex parte* answer, crediting the officer's testimony, could have resolved any doubt in the state's favor, triggering the jury to reach a verdict "shortly after" the answer.

Ultimately, Jewell's arguments ignore the strength of the remaining evidence and rest on too many "mights," "may haves," and "coulds" to sow grave doubt. The trial court's answer may have improperly credited the officer's testimony, but Jewell never disputed the numbering. For Jewell's theory to be accepted, the jury would have had to find the officers so unbelievable that they rejected even unchallenged portions of the officers' testimony. Moreover, the DNA evidence, identifying Jewell as the "major contributor" on the hat, provided strong independent evidence supporting the jury's verdict. While a verdict came "shortly" after the trial court answered, the record does not reveal whether "shortly" means two minutes or two hours, lessening any inference that the trial

court's *ex parte* answer was determinative. Accordingly, even if the jury disbelieved the officers, the matter is not so evenly balanced as to be in "virtual equipoise as to the harmlessness of the error." *O'Neal*, 513 U.S. at 435.

### III.    Conclusion

For the reasons explained, we AFFIRM the district court's denial of habeas relief.